All right, the next case on the docket is consolidated cases. In re J.E.W. a minor, cause number 5-10-496 and in re J.L.W. a minor, cause number 5-10-497. And Ms. Blades, when you're ready to proceed, you may do so. Let me just state for the record, I announced this at the 9 o'clock docket, but Justice Goldenherz is on this panel. However, he had a family medical situation that prevented him from being here today. He, of course, has the briefs and will be able to listen to the argument, which is recorded, and he'll do that before the case is decided. Okay, thank you. May it please the court, counsel. I'm Rhonda Blades, and the woman sitting behind me is Theresa Wilber. She's the subject of this case. Theresa has two children, ages 9 and 11, and on April the 29th, 2010, she was found to be an unfit parent. And those findings were made pursuant to a failure to maintain a reasonable degree of concern, a failure to protect the child from an injurious environment, and a failure to make reasonable progress within nine months of adjudication. Now, in this case, adjudication happened September 25th, 2007, so nine months from that time period, the trial court said would have been June 25th, 2008. The issue for review today is whether the trial court, and it was Judge Lambert that was on this case, whether the trial court could reasonably have found clear and convincing evidence to have supported the unfitness. Now, the convincing part, Judge Lambert actually cited in his order that he found the caseworker more credible than the mother in this case. But I think where the issue lies here is the clear part. Was the evidence clear? And in my reading of the record, and I was not counsel during any of this, but in my review of all of the transcripts in the record, the state's evidence contradicted itself throughout the course of these proceedings. Now, just to kind of take a brief moment here and step back, I'd like to tell you why I think that this case should be important to you. I'm not a soft-target person. If a parent deserves to have their parental rights terminated, I say, you know, let's do it and get on with it. It's not about that. I think that parents' rights should be terminated if they don't comply. But what I see happening in the court systems and the trial court systems today is that we are the government, meaning DCFS, meaning Lutheran, the courts, everyone that's involved in this, we, the government, are taking these children from these parents. And in doing that, I don't think that we, the government, should be making any mistakes. I think this is a tremendous right that we're taking from these people, and we should not be making mistakes. Did not the record reflect the failure to take drug tests and a failure to attend different meetings without a surprise drug, you know, when it was not told in advance there would be a drug test? Is that not true? You're right. So is that part of the clear part? Or as you say, that is wrong. I mean, it was not decided properly. I think that that's part of the clear part because the state's evidence contradicts itself on that point. So in other words, all drug tests were taken when asked and there was no advance notice of drug tests so that we would have a visitation? Not all of the drug tests were taken in advance. I'm not going to say that. But what I'm going to be referring to is the fact that the state's evidence in one portion of the proceeding said, well, she's in compliance with these random drug tests. And then in the unfitness hearing, no, she never complied with the random drug test. And that was actually from the same witness. That was from the caseworker that was in this case. You're saying the truth is somewhere in between those two extremes. I think that's right, yeah. But in the end, I want us, I want the government to be able to say, you know what, we did everything that we should have done, and you, parent, were the one that messed up, not us. And I think that when we start looking at the evidence here, we're going to see that there were some major inconsistencies between what we, the government, should have been doing and what was actually done. So what would offset the test? I think there was some testimony in the record about the children were dropped off and then not seen for days, and then one time even a week. Now, has that been contradicted by some other evidence? That was testimony of a brother. And I believe that that may have been contradicted by the mother. But that was also testimony by the brother at a time before the children ever even came into care. And I can't say directly in the record where that testimony was contradicted by the mother, but I do believe that I remember that. I'll turn to the facts now. I think the biggest mistake in this case is that we have two service plans. There was a September 2007 service plan and a March 2008 service plan. And the trial court referred to the fact that none of these service plans had ever been satisfactory. And when I finally took a look at those service plans and looked and looked and looked, it dawned on me that those service plans were the exact two service plans. They were the same ones. They had both been evaluated in August of 2007. The only thing different about those service plans was there was a fresh file stamp on the March 2008 service plan as opposed to the September 2007. Katie, what you're saying is they were identical? Exactly. And tell me, what would be wrong with that? Well, what was wrong with it is that— I mean, wouldn't they just be saying, we want the same things to happen, whatever it is, adequate housing and so forth? Well, I guess I'm referring to specifically the evaluation. There should be evaluations done, fresh evaluations done. You're not talking about the goals. Right. You're talking about the evaluation of whether the service plan had been met. Okay, go ahead. That's correct. And so the evaluations in both of these were unsatisfactory across the board, and it's because they were the same service plan. As a technicality, Lutheran Social Services, which was the private service agency for DCFS in this case, they didn't even bother to file a service plan until September 4th of 2007, and that was 200 days after the trial court had ordered that the service plan be on file pursuant to the statute. Another mistake is that all of the service plans in this case were rated unsatisfactory as to Teresa on signing consents, and yet there was never any testimony as to when the caseworker, if the caseworker ever asked for consents, and it's actually in the record that the consent for the substance abuse, it's in the record at C-120, it had been signed by Teresa. And so I think that that casts doubt on the rest of these unsatisfactories with regard to the fact that she didn't sign consents, because clearly she did. You're talking about consents for information. Correct. Regarding the parenting course, she was always rated unsatisfactory on that, and yet she completed it. She had received her certificate, and it was after the completion of the, I think it was called the early years, and that was with Rochelle Wilkerson, it was after that completion that the service plan then added a little blurb at the end that she needed to complete the task of parenting education. After she did that, then in the service plan it added, and demonstrate understanding of material. And so that's why they checked her unsatisfactory for that one, presumably. Also, with regard to that parenting program, Rochelle Wilkerson had testified that that parenting program was directed at parents who have behaviorally disordered children. That's not the case with these children. Even in the integrated assessment, they noted that the children were very well behaved. And so Rochelle Wilkerson had testified that mom wasn't acknowledging that she had any of these problems. Well, it's because she was referred to a program for behaviorally disordered children. Also, just as an aside, practically speaking, when we get into the trial court realm, if a parent gets on the wrong side of a caseworker, that generally can be quite bad. And I think that that's probably the root of this case. The caseworker testified that Theresa was argumentative with Egyptian mental health, meaning Rochelle Wilkerson at one point. The caseworker testified as to that. When Rochelle Wilkerson was put on the stand, though, Rochelle Wilkerson said, no, she's never been argumentative. With regard to the substance abuse treatment, first of all, the trial court was just wrong whenever they said that there had been three refusals to complete the substance abuse treatment. There had been two refusals, two referrals, two refusals, and that was on the advice of Theresa's counsel, Alan Downman, because at the same time, there was a pending criminal case. And it's in the record that Mr. Downman had suggested that Theresa not enter counseling at that point, as it could and probably would be used against her in any type of criminal case, as well as the fact that it's important to be forthright during counseling. So the first two were denied. On August 1st, Alan Downman had sent a letter to LSSI, Lutheran, stating that, okay, we'll go ahead and go forward with counseling now. That referral didn't get made until October 24th, 2007. That's three months later. And so, therefore, the assessment didn't occur until a month later than that, which was November 27th, 2007. Now, based on that assessment, the assessment said that Theresa should only go to intervention services. And then in the course of those intervention services, she was referred to treatment on March 2008. Now, these intervention services, I guess they're less than the actual treatment program. And in the record, it's stated that the caseworker had informed, after she was being involved in these intervention services, that the caseworker had informed the counselor for intervention that Theresa had drug-tested positive back in March of 2007, and that's the reason that she was then closed and referred to the treatment. But March 2008, she was referred to treatment, and she completed that treatment in December of 2008. Now, I think that that's important, because the trial court said that she never completed treatment, and that wasn't it. Is it in the record? Is she completed it? It is, and it's in the testimony of Lucinda Holdren, and she was the counselor at the MATRIX program. She said that Theresa completed the program December 2008, and then she had the choice of attending aftercare, and she chose. Theresa chose to attend aftercare, but she didn't have to. And there are statements in the state's brief that she was only partially compliant, not compliant during certain months, but all of those months were after she had already completed the December 2008 program and was under no mandatory requirement to attend this aftercare. With regard to the random drug drops, as you had suggested earlier, the trial court stated that Theresa refused 100 to 150 requests, and that came from the caseworker's testimony at the unfitness hearing. However, earlier in the process, the caseworker had stated on several occasions that in early 2008, she testified that Theresa was complying with testing two to three times a week and all tests were negative. In February, beginning of February 2007, they were giving her two to three times per week random drug testing. And as well, she was also in the TASC program. She was giving drug testing through there. And yet I think all that we can identify is that out of all the drug tests, there were six positives, and not all of those are for meth. There was only one for meth. One was on June 19, 2008, and it tested for a small amount of alcohol. And Theresa admitted that she had drank a wine cooler that afternoon. Up into September 9, 2008, that was the only positive for methamphetamine. There were two other tests, and they tested positive for opiates, for hydrocodone, and yet during that time period, Theresa had had four teeth removed, and she had a prescription for that. Now, the caseworker testified that she never saw a prescription at one point in the record. At another point in the record, she said, Well, I saw one prescription, but it was old. But Lucinda Holgren, who is at the Matrix, she testified that Theresa had shown her two valid prescriptions for hydrocodone. With regard to, I hope that I say this correctly, creatine. I believe that that's how it's correctly said. The court had stated that there were just numerous drug drops that had been diluted, and that that was as a result of the creatine levels. Now, Lucinda, Lucinda Holgren, Lucinda had stated, and she's the Matrix person. She's the counselor for drug treatment. She had testified that, first of all, creatine is a naturally occurring substance in our bodies, and that creatine levels, if they're low, that would be a 20 or below, and that would indicate that the person was trying to flush their system by drinking just unlimited gallons of water. And then if they're high, that would be 100 or higher. And Lucinda had said that Theresa, that there was no evidence that Theresa ever tried to clean her system. And with regard to the evidence on behalf of Lutheran and the caseworker, they never stated at any point what the creatine level was, and I believe that they actually referred to it as a bodybuilding substance. With regard to these inconsistencies, and I just picked out the major ones. There were other more minor inconsistencies, but these were the ones that I think should really change this case, because some of the things that were testified to at the unfitness hearing just simply weren't the case seven, eight months prior when the same person was testifying. And so in that regard, I think that for that reason, we should begin to hold these private service agencies as well as providers that work with these people that we the government put into the system, and I think that we need to start holding them to a higher standard of care. Well, you keep talking about that. However, there's a standard of review that we're bound by on review. There's a burden of proof that the trial court was bound by, and those are the standards within which we must operate, and I'm sure you understand that. Understood. Against the manifest weight of the evidence, I understand. And I think that that's where the clear and convincing goes to. I mean, what can you say about convincing? Obviously, Judge Lambert found one side more convincing than the other, but with regard to the clear part, I just don't think that the evidence was truly clear with regard to some of these major points that I've just addressed. And so with that, Your Honor, in conclusion, we would ask that this court reverse the decision of the trial court and send it back up. Thank you. Thank you, Ms. Blasey. Mr. Sweeney? Good morning, Mr. Court. I hope you have before you my amended brief. My original brief didn't include the entire record, and I had to correct that. Well, counsel says this case is about Theresa Williford, but it's really not. The subject of these proceedings are two children called Jeremiah and Hala, and those children have been in placement for four years. They're presently in an excellent home, family, friends, and they want to stay there. And the record clearly indicates that they have good reason for wanting to stay there because Ms. Williford, at all relevant times, chose narcotics over her children. And the trial judge's finding that Ms. Williford's use of drugs was frequent, abusive, and uncontrollable is, in fact, fully supported by the record, both as to the time she had custody of these children and during the relevant nine months after adjudication. Now, how do we know that Theresa Williford's drug abuse was out of control when she had the children? Well, her brother, David Bartok, and her adult son, Dylan Williford, testified to that. They weren't social workers. They weren't the government. They were her brother and her son, and they testified that she was an unfit parent because of drug abuse. I think the trial judge could reasonably conclude that if the respondent's brother and son say that she didn't properly care for the children because she was using drugs, that she could conclude that that was true. There was also the incident which led to the removal of the children. The car was stopped by the police who were investigating a purchase of methamphetamine ingredients. There were four young children in the car, two Jeremiah and Jalop, and two of the respondent's grandchildren. Also in the car were a baggie containing cocaine, open cans of beer, and precursors or ingredients for the manufacture of methamphetamine, as the trial judge found, which had been purchased in the course of that trip. The trial judge could reasonably conclude that drug use is out of control. You have to take your children and your grandchildren along on a mission to purchase ingredients for the manufacture of methamphetamine. So what happened after the children were placed? Oh, by the way, other evidence... Maybe it's to her credit, but it certainly doesn't indicate her competence as a parent. The evidence showed that she actually didn't care for these children that much before they were placed in foster care because there was testimony that the children were frequently dropped off with their aunt, Tracy Bartok, and left there for unpredictable periods of time, and that they spent up to six months prior to placement with another aunt, Amy Bartok. And Jeremiah told the social worker that even when they weren't left with one of their aunts, that the mother would leave them alone, the children alone for days at a time when they were six years of age or younger. So you've got a really serious problem here for this mother, and the trial judge correctly concluded that there was a very serious problem with drug usage. Now, the nine months after adjudication ended on June 25, 2008. Now, prior to that nine-month period, she said it was on advice of counsel, but I don't see how it would incriminate her to go into rehabilitation, provided she didn't talk about the specific charges against her. Then, after the nine-month period started, she was referred to Franklin Williams and Human Services and was with that program for about six months during the nine-month period. She was terminated unsuccessfully from that program because the counselor concluded she was lying about the extent of her methamphetamine use. So, in the heart of the nine-month period, she failed to complete rehabilitation and was terminated from it for dishonesty about the extent of her drug use. She was then referred for a third time to the program that she had refused twice before, Matrix of Hope, specifically designed for methamphetamine users. She began that program on May 6, 2008, about a month and a half before the end of the nine-month period. So, just on the basis of that alone, the trial judge could find a failure to make reasonable progress and reasonable efforts during the nine-month period because she didn't start any drug abuse program except for the one in which she was unsuccessful at until almost the end of the period. Now, was she successful in dealing with her drug use in Matrix of Hope? Well, it wouldn't matter because she didn't complete that program until long after the end of the nine-month period. But there was testimony in which the trial judge was entitled to believe that before, during, and after the end of the nine-month period, respondents tested positive for alcohol or controlled substances repeatedly. Specifically, there were positive tests for methamphetamine, opiates, or alcohol on February 26, 2007, June 19, 2008, September 9, 2008, November 11, 2008, November 25, 2008, February 2, 2009, and May 27, 2009. That clearly indicates that she failed to make reasonable progress in controlling her drug abuse during the nine months after adjudication. Furthermore, remember, this is a very experienced drug user who knows how to manipulate the system. Therefore, it is very significant that there were diluted samples, in other words, submitted on many other dates, August 6, 2008, August 11, 2008, December 2, 2008, December 9, 2008, January 13, 2009, and January 20, 2009. These were samples which were so diluted that they couldn't be tested for illegal drugs. The trial judge could reasonably conclude that Ms. Williford was manipulating the system by flushing out the illegal drugs from her system before those tests. And another fact which indicates that she was still abusing drugs before, during, and after the relevant nine-month period is that she never complied with a random drug test. All the tests which she took, and sometimes failed, and sometimes submitted diluted samples for, were on scheduled dates which she knew about. That was the testimony at the On Fitness hearing. Now, counsel says that at an earlier hearing, years before the neglect adjudication, there was testimony that respondents submitted to random drug tests for a two-month period long before the nine months in question. That's not true. There was testimony that she was tested regularly during that period and one positive test for methamphetamine and the others were negative. Again, this is two months after the case started, hardly relevant to the nine-month period. But there was no testimony that those were random drug tests. And in any event, it doesn't matter for purposes of this court's review because that was another hearing which is not the one under review here. And that testimony was never used during the On Fitness hearing, was never used in the attempt to impeach the caseworker, and was never raised by anyone in connection with the issue of On Fitness until this appeal. I mean, you can't go back and take some hearing which isn't an issue and then decide that it impeaches testimony at the hearing which is under review when it was never used at the hearing that was under review. Furthermore, if you're going to consider the testimony at the neglect hearing, Ms. Wolfert took the stand and specifically admitted that she was refusing drug testing starting two months after the children were removed from her custody. So the testimony at the neglect hearing supports more than it impeaches the testimony of the caseworker at the On Fitness hearing that respondent never submitted to a random drug test during the entire period that the children were in place for. So, here you have a person with a very serious drug problem who flunks out of the sole program that she was in for almost all of the relevant nine-month period, who begins another program only towards the end of the nine-month period, and before, during, and after the nine-month period repeatedly tests positive for controlled substances or alcohol or submits invalid samples. So you can see why the judge concluded that the drug usage by this respondent was frequent, abusive, and uncontrollable even when she had a duty to work towards return of the children. Now, just a few more points. The... Ms. Wilfrid claimed that she had a prescription for hydrocodone, which is an opiate comparable to morphine, which is one of the substances she testified... she tested positive for on two occasions in November of 2008. But that prescription was supposedly for an operation which took place in September, a month and a half before, and was for five days of doses. I mean, no physician is going to have someone take an opiate for a month and a half following dental surgery. The prescription, the trial judge could readily conclude, was a smoke screen. She got a prescription for five days of doses and then was using hydrocodone a month and a half later. And as for the allegation that the judge incorrectly found that the respondent had not completed the Matrix of Hope program, as a matter of fact, the judge's written findings specifically stated that she had completed the initial program but had not completed aftercare. And indeed, she had not adequately complied with aftercare, because her counselor, whom she called as a witness, admitted that during approximately five months of the aftercare program she was rated unsatisfactory for non-attendance. In other words, she didn't show up for all the sessions. And the trial judge could readily conclude that the reason she didn't show up for all the sessions is that she knew she would be tested at them and would probably flunk the test, as indeed she did flunk some tests. So there was more than enough evidence for the trial judge to conclude that this respondent had an extremely serious drug problem and failed to make reasonable progress or reasonable efforts to correct it during the nine months following adjudication. There was also testimony that the respondent was regularly late for visitation with the children, that she upset the children by saying that they were going to come home soon, that she failed to comply with other rules concerning visitation, that she skipped many visits, that she never provided proof of a lawful source of income, even though there was testimony that every weekend an unusual number of men, many with criminal records, would gather at her home. And again, she failed to meet the requirement of the service plan that she identified positive support plans, in other words, persons, rather, in other words, stop associating with criminals and start associating with people who would help her with her drug habit. Ms. Wolford knows how to manipulate the system, and has been manipulated enough to avoid positive drug tests or repellent samples, and therefore the judge would conclude that she failed to make progress. Thank you. Thank you, Mr. Sweeney. Any rebuttal, Ms. Blake? Yes, thank you, Your Honor. Just as a clarification as to some things mentioned, first of all, as a background, the children had always resided with their mother up until the time that they came into the care of the state, and thereafter they never went back to the care of their mother. It was discussed the incident which led to the removal. That's not the issue. The incidents of Teresa leaving her children in the care of family members before that, that's not the issue, because the purpose of the Juvenile Court Act is to correct the conditions which led to the removal. And so that was the purpose of what was going on here. With regard to the drug program, and I may have pointed this out before, but we're looking at that nine-month period in one of these points, and there was a two-month lag time from September 25, 2007, date of adjudication, until she could actually get in for her first assessment, November 27, 2007. I would disagree with counsel in that I believe that he stated that there were positive tests for methamphetamine on November 11 and November 25. That wasn't the case. Those tests were for the hydrocodone, the opiates. Also, I believe that what was stated was there was a positive test for methamphetamine on June 19, 2008. That's not correct. That was the test for alcohol, and I couldn't follow him down the rest of the list. With regard to the visitations, it was argued that she didn't comply with the visitation plans because she was making statements to the children. Specifically, in the record, the facts that surround that are that at one point, when the children first began to come to visitations, they asked their mother, when are we going to be home? She said, hopefully soon, maybe by Christmas. That was her first strike. Then the caseworker had a talk with her, I guess. Two other episodes that the caseworker had mentioned was that at one point, Mother was floating in the pool behind her house with the two children. They were all on rafts, and they were out of hearing distance of the caseworker. That was number two. Then number three was that the kids had four-wheelers there, and they all went and rode their four-wheelers, and they were out of the distance, of the hearing distance of the caseworker. Also, and it kept popping up, these people with criminal records. Although these people were never identified, their criminal records were never identified, it was just blatant hearsay throughout the course of the proceedings when referring to that. With that, Your Honor, I think that I hopefully have addressed all of the points. If you have any further questions, I'd be happy to answer them. Thank you very much. All right. Thank you both for your briefs and your arguments. We're going to take these two consolidated cases under advisement.